# Charles D. Kaier Company, Limited, *v.* O'Brien, Appellant.

202        153
  23 SC [1]528
202        153
  29 SC [1]340
  30 SC [1]643

202      153
38SC [2]402

*Judgment—Opening judgment—Discretion of court—Evidence.*

An application to open a judgment entered on a warrant of attorney is addressed to the equitable powers of the court, and on appeal the question is whether there had been a rightful exercise of discretion. The measure of proof required to send a case to the jury cannot be defined by rule, but it may be said that while a mere conflict of evidence is not generally sufficient, the defendant should be allowed a trial where he has shown by a preponderance of evidence, sufficient to sustain a verdict in his favor, that he has a just defense.

A rule to open a judgment entered on a bond against two sureties should be made absolute, where it is shown that as to one of the sureties the signature was not genuine and there is no testimony that he authorized any

one to sign the bond for him, and that as to the other surety, all the members of his family testified that the alleged signature was a forgery, and there was no evidence that any one saw him sign the bond, or knew that he had ever been asked to sign it, and no one testified that the signature was his.

Argued Feb. 17, 1902.    Appeal, No. 186, Jan. T., 1901, by defendant, from order of C. P. Schuylkill Co., Nov. T., 1897, No. 220, discharging rules to open judgment in case of the Charles D. Kaier Company, Limited, v. James M. O'Brien, James Hullihan and John Hullihan.    Before McCollum, C. J., Mitchell, Fell, Brown and Potter, JJ.    Reversed.

Rules to open judgment.

The facts appear by the opinion of Shay, J., which was substantially as follows:

A bond, given to the Charles D. Kaier Company by James M. O'Brien for the sum of $2,000, with James and John Hullihan as surety, was entered by plaintiff, and subsequently the petition of James Hullihan, administrator of John Hullihan, deceased, was presented to court, setting forth, inter alia, as follows:

" That the said James M. O'Brien on February 1, 1897, was appointed agent for the sale of the product of the brewery and wines and liquors of the said, the Charles D. Kaier Company, Limited, in the towns of Ashland, Girardville and vicinity, in the county of Schuylkill and state of Pennsylvania, and it was expected that in the course of such agency, said O'Brien would come into the possession of moneys and property belonging to the said, the Charles D. Kaier Company, Limited.

" That in pursuance of said agreement, the said James M. O'Brien gave a bond to the said Charles D. Kaier Company, Limited, in the sum of two thousand ($2,000) dollars, the conditions of which were that he should well and truly pay to the said Charles D. Kaier Company, Limited, its successors or assigns, all moneys due or to become due to it by reason of the said contract of agency at the times agreed upon in said contract, and that at the termination of the said agency he should return to the said, the Charles D. Kaier Company, Limited, in good condition, all such property as had been intrusted to him

for use in said agency, and would in all things well and truly observe, perform and keep all and singular the agreements, articles and conditions, which on his part ought to be observed, performed and kept, comprised and mentioned in said agreement of agency according to the true intent and meaning of the same.

" That on his appointment as administrator he at once instituted inquiry as to the judgments, claims and demands against said estate.

" That he then for the first time made a personal examination of the bond above referred to in the prothonotary's office, and found that it contains the name of said John Hullihan, which purports to be his signature as a surety on said bond, but he verily believes that said signature is not the act or deed of said John Hullihan, but was put upon said bond without his knowledge, authority or consent, all of which the petitioner verily believes," etc.

On this petition a rule was granted on the plaintiff company to show cause why said judgment should not be stricken off or opened.   A similar petition of Margaret Hullihan, widow of James Hullihan, was read in court and a like rule granted. Voluminous testimony has been taken, argument was made before us, and from it we gather the following :

James O'Brien became agent for the Charles D. Kaier Company in February, 1897, and as such agent, was required to furnish a bond to the company, conditioned for the faithful performance of his duty, etc., and he gave such a bond with James and John Hullihan as surety.   This was a judgment bond, and the plaintiff entered judgment thereon in the prothonotary's office, and these rules were taken for the purpose of opening or striking off said judgment as to the sureties. The allegations in the petitions are that both these signatures are forgeries.

O'Brien, in his evidence, testifies that he called on John Hullihan and talked to him of the bond, and Hullihan said he should leave it there and he would see what could be done in the matter.   That later on he called again ; Hullihan was sick in bed, and he (O'Brien) went in the cellar to tap a keg of beer for use at Hullihan's bar, and upon his returning upstairs, he saw the bond back of the bar, picked it up, and while

driving to Mahanoy City, opened the same and saw the names of James and John Hullihan signed to the bond, and he delivered it to the Kaier company.

O'Brien's statement of the manner of signing this bond is in many respects remarkable, and we are of the opinion he conceals, rather than reveals, the truth in reference thereto. Papers with the acknowledged signatures of both of these sureties have been offered in evidence, and from a close and careful inspection of the same and comparison with the signatures on this bond (though we are by no means expert in the comparison of handwriting), we can reach but one conclusion, viz: that the signature of John Hullihan was not written by him, and we are as firmly convinced on the other hand that the signature of James Hullihan is his own handwriting. Members of the families of both James and John Hullihan swear that these are not the respective signatures of these men, but we are firmly convinced that our conclusion above is the correct one. Neither do we think the evidence on the question of whether or not John Hullihan authorized any one to sign for him is sufficient to establish the fact that he did not so authorize some one. This testimony is of course negative in its character, but to our mind it proves nothing.

O'Brien testifies that all his actions and conversations in reference to the signing of this bond were with John Hullihan, that he never spoke to James at all about it. James Hullihan's signature, as we said above, we believe to be genuine, and from the only direct testimony in the case, that of O'Brien, he procured the signed bond at the home of John Hullihan, the one, whose signature, we believe, was not written or placed there by himself, and from this testimony, we are led to believe that John Hullihan directed some one to sign his name for him to the bond in question. If O'Brien never had any conversation with James Hullihan, and his signature is genuine, as we believe it is, and the bond was obtained at the home of John Hullihan, how would the signature of James Hullihan be on the bond without John knowing it was there, and being left at the home of John for the purpose of getting sureties upon it, is it not undoubtedly a fact to be gathered from this testimony, that John Hullihan directed someone to sign for him. We can view this case in no other light, consistent with the facts as testified

to by O'Brien, whose testimony is the only direct evidence we have.

Unfortunately, both the sureties on this bond are dead, and as we said before, the only direct testimony is that of O'Brien, and we do not believe he tells all he knows as to the signing of this bond.

The representatives of the estates of these two men seek, in these rules, to relieve their properties from the burden of this judgment. The presumption of law is in favor of the genuineness of these signatures and the evidence submitted to us is not such as to overcome this presumption. It does not appeal to our discretion with sufficient force to convince us that this is such a case as should go to a jury. We, therefore, have come to the conclusion that these rules must be dismissed.

*Error assigned* was the order of the court discharging the two rules.

*W. K. Woodbury* and *John F. Whalen*, for appellant.—The exercise of jurisdiction to strike off judgments in proper cases and to open judgments entered on warrants of attorney has always been held to be within the sound discretion of the court, and this court will review the action of the court below: Earley's Appeal, 90 Pa. 321.

Under the testimony produced by the petitioner in this case, the burden was on the plaintiff to show the execution of the bond of John Hullihan; Haldorn v. Hassitt, 7 W. N. C. 162.

Where there are corroborating circumstances or circumstances from which inference may be drawn corroborative of defendant's testimony, it is proper to open the judgment and refer the question to the jury: Stockwell v. Webster, 160 Pa. 473; Heiss v. Banister, 176 Pa. 337.

A fraudulent or void judgment should be stricken off and the court will review the action of the court below refusing to strike off such a judgment: Knox v. Flack, 22 Pa. 337; Wright's Exr. v. Cheyney's Adm., 1 Chester Co. Rep. 237; Bechtel v. Bittinger, 8 York Legal Record, 137.

If the judgment appears upon the face of the record to be a nullity, the court may be properly asked to declare it so, and strike it off: Phila. to use v. Jenkins, 162 Pa. 451.

The testimony in behalf of the petitioner was clear, precise and positive, and the prudent course and one fair to all parties should have led the court below to make absolute the rule to open the judgment in question: Jenkintown Nat. Bank v. Fulmor, 124 Pa. 337; G. Pearson Cloud, Exr., v. Anna Mary Markle et al., 186 Pa. 614; Fisher v. Holbrook, 7 Pa. Superior Ct. 647; Schweyer v. Walbert, 190 Pa. 334.

*Edward Maginnis* and *William Wilhelm*, for widow and heirs of James Hullihan.

*E. D. Smith* and *W. P. Ramsay*, for appellee.—A rule to open a judgment is an appeal to the equitable powers of the court to let the defendant into a defense: O'Hara v. Baum, 82 Pa. 416; Adams v. Grey, 154 Pa. 258; Com. v. Mellet, 196 Pa. 243.

Upon appeals of this character the court only decides whether the discretion has been properly exercised upon the evidence: Earley's Appeal, 90 Pa. 321; Hickernell's Appeal, 90 Pa. 328; Kneedler's Appeal, 92 Pa. 428; Jenkintown Nat. Bank's Appeal, 124 Pa. 337; La Roche Electric Works v. Emery, 173 Pa. 331; Massey v. Blair, 176 Pa. 34.

OPINION BY MR. JUSTICE FELL, March 24, 1902:

Judgment by confession was entered on a bond against James O'Brien as principal and James Hullihan and John Hullihan as sureties. After the death of the sureties rules to open the judgment were granted on the petitions of the representatives of their estates. The ground of the applications was that the sureties had not signed the bond, and the issue raised was distinctly that of forgery. The bond was not witnessed and no one saw either James or John Hullihan sign it, and no one testified that their signatures were genuine. O'Brien testified that he told John Hullihan that he was required to give a bond with sureties, but did not ask him to sign the bond; that he was told by John to leave the bond with him, and he would see whether he could do anything in the matter; that he afterward called at John's saloon, saw the bond on a shelf back of the bar, and took it away with him, and on examining it on his way home found the names of James and John Hullihan signed to it. He did not know their signatures and had not spoken to

James about the bond. A number of witnesses testified that both signatures were forged, and all the members of John's family testified that the bond was not signed by anyone by his direction.

From this testimony the learned judge found that James's signature was genuine and that John's was not, but that John had directed some one to sign the bond for him. The finding as to James was based on a comparison made by the judge of the signature on the bond with an admitted signature, and on it is based the finding that John authorized some one to sign the bond for him. The substance of the reasons given as to John's authorizing some one to sign for him is that as O'Brien had not spoken to James about signing the bond and had left it at John's saloon in order to obtain sureties, and afterwards found it with both names signed to it, John must have known that James had signed it, and he must have authorized some one to sign for him. In other words, that as the bond was signed by James and found in John's possession, there must have been a conference between them, and that as one signature was genuine, the other was authorized.

The reasons stated are not satisfactory but it is needless to consider them. The radical error in the finding as to the signature of John is that the burden of proof was shifted. The learned judge says in the opinion filed: " Neither do we think the evidence on the question, whether or not, John Hullihan authorized anyone to sign for him is sufficient to establish the fact that he did not so authorize some one. This testimony is of course negative in character, but to our mind it proves nothing." The administrator was under no duty to show that the signature was not authorized. The burden was on the other side. Having shown that the signature was not that of John, the defense was complete in the absence of clear affirmative proof that some one duly authorized had signed the bond for him. Nor can we sustain the finding that the signature of James was genuine. As before said, no one saw him sign, no one knew that he had ever been asked to sign, and no one testified that the signature was his. All the members of his family testified that it was a forgery. This clear and positive testimony, to which greater weight should be given because of the fact that John's signature to the bond was not in his hand-

writing, is wholly disregarded by the learned judge because of the resemblance which he finds between the signature of James on the bond and his genuine signature on another bond which he signed as a witness. The testimony is so overwhelming and so fully corroborated by the circumstances that the case should have been sent to the jury.

An application to open a judgment entered on a warrant of attorney is addressed to the equitable powers of the court and on appeal the question is whether there has been a rightful exercise of discretion. The measure of proof required to send a case to a jury cannot be defined by rule, but it may be said that while a mere conflict of evidence is not generally sufficient, the defendant should be allowed a trial where he has shown by a preponderance of evidence, sufficient to sustain a verdict in his favor, that he has a just defense : Earley's Appeal, 90 Pa. 321 ; Jenkintown Nat. Bank v. Fulmor, 124 Pa. 337. In Mitchell on Motions and Rules, p. 78, it is said : " A defendant who has only enough evidence to produce a fair conflict, ought not to prevail against a plaintiff, who has also evidence amounting to a fair conflict plus the written instrument. . . . The true rule, to which I believe the courts must ultimately come, is that the defendant should show a preponderance of evidence that a jury ought and probably will find in his favor." Here the writing had no weight whatever as its genuineness was in issue. There was clear affirmative and uncontradicted testimony that the signature was a forgery, and against it an inference drawn by the judge, who was not an expert in the comparison of handwritings, founded on the resemblance of the disputed signature to an admittedly genuine one.

At the argument it was suggested that no appeal had been taken by the representatives of the estate of James Hullihan. Both defendants were originally represented by the same counsel, and the rules taken related to the same judgment, and were heard and considered together and disposed of by the court by the order from which an appeal has been taken. It was no doubt the understanding that the appeal taken from this order covered both cases, and we will so regard it. The order of the court discharging the rules to open the judgment and to let the defendants into a defense is reversed and set aside, and the rules are now made absolute.